## THE FRANKLIN BUILDING ASSOCIATION *vs.* SAMUEL S. MARSH.

If an association organized under the act establishing mutual loan and building associations, (*Nix. Dig.* 75,) by the sale of loans at a premium, or the purchase of shares at a discount, cause the shareholder to pay more than legal interest for the money he borrows, it is not usurious.

---

In ejectment on case certified from the Essex Circuit.

Argued before the Chief Justice, and Justices OGDEN, VREDENBURGH, and BROWN.

*T. Runyon,* for plaintiffs.

*O. S. Halsted, Sr.,* for defendant.

The opinion of the court was delivered by

The CHIEF JUSTICE. This is a case from the Essex Circuit for the advisory opinion of the court. The question is, were the bonds and mortgages upon which the plaintiffs' title depended, valid or not?

The plaintiffs are a corporation under the act to encourage the establishment of mutual loan and building associations, (*Nix. Dig.* 75.) The defendant is now, or at the giving of the mortgages was, a member of the association.

The plaintiffs' title consisted of two mortgages, made by defendant, upon the premises sought to be recovered, the first dated March 10th, 1856, expressed to be in consideration of $1526, with a proviso that if Marsh paid $21 per month until the termination of the association, and all fines imposed upon him as a member of the association, and kept the premises insured and free from assessments, &c., &c., then the mortgage was to be void. The other mortgage was dated 9th June, 1856. The consideration expressed, $436. The monthly payment, $6, to be made until the termination of the association.

There are other stipulations in the mortgages, which do not seem to be necessary to the determination of the questions upon which the case must turn.

The principal objection made to the validity of the mortgages was—

I. That they were conditioned for the payment of monthly installments for an indefinite period, and that the sum paid in that way might greatly exceed the money loaned and lawful interest.

II. That the whole mode of proceeding in making loans was unauthorized by the act of the legislature.

To determine the validity of these objections, it will be

necessary to examine to some extent the articles of association and by-laws of the association and the mode in which the loan to the defendant was made.

The act of the legislature authorizing the formation of such associations does not prescribe with much particularity the extent of their powers or the mode of their exercise. It rather treats the business as a recognized mode of proceeding well known in this state, and authorizes the formation of associations for carrying it on. The first section of the act authorizes the formation of associations for the purpose of assisting those who then are or thereafter may become members, in the purchase of lots, and building thereon dwelling-houses, or in paying for houses and lots which they have already purchased.

The 4th section provides that every association may adopt such form of constitution as to them shall seem right and proper, and may alter and amend the same from time to time in the manner therein provided. They may also make penalties for breaches of the constitution, not exceeding ten dollars; but nothing in said constitution or the by-laws shall be repugnant to the constitution of this state or the United States.

The 5th section enacts that the investments of every such association shall be made in loans to, or in the redemption of shares of or in purchasing lots and in erecting dwellings for the members, or in all of said modes, as the constitution of the particular association shall provide, and that no premium given for the priority of loan or acquisition of a building or discount given on the redemption of shares shall be deemed to be usurious.

Section 6th, that all matters not herein provided for shall be regulated by the constitution and by-laws of such association respectively.

It is difficult to conceive in what way, or by the use of what language, larger powers could have been conferred, to be used for the encouragement of purchases of lots, and building upon them. They are authorized to adopt such

constitutions and by-laws as may seem fit, not repugnant to the constitution of the state or the United States, and make penalties, not exceeding ten dollars, for breach of the constitution and by-laws.

The moneys to be invested in loans to the members, in the redemption of the shares of members, in purchasing lots, and erecting dwellings for the members.

No premium given on a loan, or discount given for the redemption of shares is to be usurious.

So beneficial were they considered that parents and guardians and trustees of married women were authorized to invest for their *cestuis que trust* in these associations. The laws against usury and forbidding penalties were virtually repealed in their behalf.

It would seem that the question under such an act would rather be, what these associations might not do, than what they might, so large and liberal are the powers given.

Whether the constitution of this association and its mode of operation differed materially from those of other associations under the act, or existing in other places, whence the idea came, did not appear upon the trial. It is fair to assume that they did not.

The mode in which the funds of this society were raised was by monthly payments made by each member, on account of each share owned by him, an entrance fee of fifty cents a share being paid at subscribing. The monthly payment was two dollars per share. Whenever, by the receipts of these entrance fees, fines, and monthly payments, the funds of the society on hand shall amount to enough for the redemption of one or more shares, the money is to be applied to the redemption of any share the holder of which shall agree to receive the lowest sum therefor.

The payments were, by the articles of association, to continue to be made by the owners of the shares until each unredeemed share amounted to $400.

Franklin Building Association v. Marsh.

The mode of borrowing money of the association was this: the borrower went to some member of the association, if he was not himself a member, and purchased such number of shares as would, at the lowest price bid by the members per share at an auction for that purpose, amount to the sum to be borrowed. The defendant in this case, in order to get the first loan of $1526, bought of other shareholders seven shares, on which the dues had been paid up to that time, and thereby became a member of the company, and liable to the payment of the monthly dues and fines upon those shares; and if he had continued making such payment till the shares amounted to $400 each, he would have been entitled to receive on his shares $2800.

At the auction held by the company for the redemption of shares, he offered to sell these shares for $218 each, that is, $1526 for the seven shares; and, being the lowest bidder, or having offered his shares at the lowest price, the association took them at that price, that is, agreed to pay him $1526 for them then, instead of $2800 at the end of the association, he to continue paying the monthly dues of $2 per share, and $1 per share redemption money, until the termination of the association, that is, until the other shares reached, by the accumulation of profits, $400 each. This sum the association paid to him, and took from him a mortgage to secure the payment of $3 per month for each of the seven shares thus redeemed or discounted.

The purchase by the association of the seven shares by the present payment of $1526, instead of the future payment of $2800, is called a redemption of the shares. The bonus which the borrower paid was the the difference between the actual cash value of the shares and the price at which he sold them to the association. This is what the act means by discount given on the redemption of shares, which is not to be held usurious.

The act clearly authorizes a member of such an associ-

ation to sell his shares to the association at any rate of discount to which he may agree, no matter how exorbitant, and continue to pay his dues until the termination of the association.

If the transaction was illegal in any respect, its illegality must lie here. The mode of collecting the funds by payment of monthly dues and fines was lawful ; it violated no law—it was in accordance with the act and the articles of association. But if the discount given is legalized by the act, there can be no illegality in the transaction. It seems to me it is so legalized beyond a doubt. Where the act speaks of discount given on the redemption of shares, it uses a term of known signification, one having acquired a fixed meaning wherever these building associations had been in operation.

Whether the bargain made by the defendant was grossly oppressive or not, depended altogether upon the amount he paid on the purchase of the shares, which the association redeemed at $218 each. One of the witnesses at the trial said the market value of the shares at the time of the giving of the first mortgage was from $132 to $135 per share. If it was $132, then the defendant paid for the seven shares $924, and received from the association $1526 for them. He then realized in money, after the purchase and redemption, $602, and agreed to pay $21 per month, to the termination of the association, besides fines, &c.

The defendant says he was informed that the association would close at the expiration of thirty-one months, and that one of the officers told him his mortgage would then be given up to be canceled. The thirty-one monthly payments would have amounted to $651, without calculating interest on the payments ; with average interest it amounts to $704.

The amount he received net, and after paying for his shares, was $602; interest on that for thirty one months is $93.31, which, with the principal, amounts to $695.31.

Upon this calculation, his bonus would have been about $9 for the loan of $602 for thirty-one months.

Lord Cranworth, in the case of *Fleming* v. *Self*, 27 *Eng. Law and Eq. Rep.* 491, very clearly states the principle of operation of these associations. He says it is this: members subscribe monthly sums, which are accumulated till the fund is sufficient to give a stipulated sum to each member, and then the whole is divided among them.

But this is not all; one main object is to enable members to obtain their share by anticipation. For this purpose, when a sufficient fund is in the hands of the treasurer, the members who desire to get the shares in advance, bid, by a sort of auction, the sum which they are ready to allow as discount, and the highest bidder obtains the same, by which his lordship meant, he that offered the greatest discount on his shares.

The Lord Chancellor further remarks: The gain to the society arises mainly from the high rate of discount which members in want of money are ready to give. In truth, the whole scheme is but an elaborate contrivance for enabling persons, having sums for which they have no immediate want, to lend them to others at a very high rate of interest. It might have been further said that these associations are but organized societies of legalized usurers, and that, by their operation, the investments of the needy members are absorbed by the usury paid to those more able. The only advantage secured is enabling borrowers to repay a loan by monthly payments somewhat within their means. In all ordinary cases it is a most expensive way of obtaining a loan, and when obtained the borrower is utterly unable to tell what rate of interest he is to pay, or how soon his debt will be extinguished. Such a mortgage was sustained by the Chancellor in *Savings Association* v. *Vandervere*, 3 *Stockt.* 386.

Notwithstanding the character of the transaction disclosed by the evidence in this case, I see nothing in it illegal, nothing that is not fairly within the provisions of

the act· authorizing the establishment of these associations.

The mortgage was not void for usury: that is authorized by the act; nor because the loan of this money may entail a great loss upon the defendants.

The Circuit Court should be advised to give judgment on the verdict.